Michael Starr (MS 6851)
Hogan & Hartson LLP
875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
Fax: (212) 918-3100
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

CHRISTOPHER CAPANELLI, : No. 06 Civ 15397(SHS) (JCF)

                      Plaintiff,

                        v. : **DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

NYP HOLDINGS, INC. d/b/a NEW YORK POST,
JOSEPH VINCENT, and LLOYD VASQUEZ,

                      Defendants.

------------------------------------------------------------------- x

Defendants NYP Holdings, Inc., d/b/a The New York Post ("*the Post*"), Joseph Vincent, and Lloyd Vazquez hereby submit, pursuant to Local Civil Rule 56.1 of the Southern District of New York, the following statement of material facts as to which they contend there are no issues to be tried. The evidence which would be admissible that supports the material facts set forth herein is to be found in the following materials:

(a) Amended Complaint filed by Plaintiff Christopher Capanelli ("*Plaintiff*" or "*Capanelli*") in the above-captioned matter on February 27, 2008 (the "*Amended Complaint*");

(b) Plaintiff's Response to Defendants' Interrogatories, dated May 22, 2008 ("*Pltf. Interrog. Ans.*");

(c) June 16, 2008, Deposition of Christopher Capanelli ("*Capanelli Dep.*");

(d) Declaration of Joseph Vincent, dated August 8, 2008 ("*Vincent Decl.*");

(e) Declaration of Lloyd Vazquez, dated August 8, 2008 ("*Vazquez Decl.*").

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**The Parties.**

1. Plaintiff worked as a pressman at the Post's printing and distribution facility located at 900 East 132nd Street, Bronx, NY 10454 (the "*Port Morris Facility*") until the termination of his employment on December 18, 2003. (Amend. Compl. ¶¶ 5, 6, 7).

2. Plaintiff is, and was at all times relevant to this action, a member of a labor union called the New York Newspaper Printing Pressman's Union Local Number 2 ("*Local 2*" or the "*Union*"). (Amend. Compl. ¶ 5; Vincent Decl. ¶ 16).

3. Plaintiff has, at various times, served as Local 2's Chapel Chairman for the Post's pressroom. (Amend. Compl. ¶ 5; Vincent Decl. ¶ 16).

4. At all times relevant to the claims and defenses in this lawsuit, Defendant Joseph Vincent served as the Vice President (or Senior Vice President) of Operations for the Post. (Amend Compl. ¶ 8; Vincent Decl. ¶ 1).

5. Defendant Lloyd Vazquez was hired by the Post in 2002 for the position of Security Manager, and has served as Director of Security for the Post since his promotion in 2004. (Amend. Compl. ¶ 9; Vazquez Decl. ¶ 2).

**Vandalism of Jason Quick's Locker.**

6. Beginning in or about August 2003, repeated acts of vandalism were directed at the locker of a Post employee named Jason Quick, an African-American pressman recently admitted to Local 2. (Vincent Decl. ¶¶ 12-14).

7. The Post believed that the vandalism of Mr. Quick's locker was related to a labor-relations dispute between the Post and Local 2. (Vincent Decl. ¶¶ 9-15).

8. In or about September 2003, the Post installed a hidden video-camera aimed at Mr. Quick's locker in an attempt to identify the perpetrator or perpetrators of the vandalism. (Vincent Decl. ¶ 14; Vazquez Decl. ¶¶ 7, 11, 12).

9. On October 24, 2003, Jason Quick reported to Mr. Vazquez that someone had once again vandalized his locker by this time etching the word "SCAB" into the locker door. (Vincent Decl. ¶ 17; Vazquez Decl. ¶ 14).

10. Mr. Vazquez personally viewed the locker and confirmed that the word "SCAB" had in fact been scratched on its surface. (Vazquez Decl. ¶ 14).

11. In Union parlance, the word "scab" is a term of intense denunciation directed to hourly workers who are regarded as being disloyal to their union and their co-workers. (Vincent Decl. ¶ 18).

12. Mr. Vazquez had last seen Mr. Quick's locker at about 4:30 p.m. the day before, on October 23, 2003, after changing the tape in the hidden video-camera, and had observed no damage at that time. (Vazquez Decl. ¶ 15).

**The Identification of Plaintiff Capanelli.**

13. After Jason Quick made his report, Mr. Vazquez and Mr. Vincent each viewed the videotape for the date of October 24 and determined that the camera had captured an individual approaching Mr. Quick's locker and defacing the locker. (Vincent Decl. ¶ 19; Vazquez Decl. ¶¶ 16, 18-20).

14. Mr. Vazquez recognized the person depicted as someone who worked for the Post, and later determined that that person was Plaintiff Capanelli. (Vazquez Decl. ¶¶ 16, 17).

15. Upon viewing the video, Mr. Vincent immediately recognized the individual it depicted defacing Jason Quick's locker as Plaintiff Capanelli. (Vincent Decl. ¶ 19; Vazquez Decl. ¶ 19).

16. Mr. Vincent's identification was based on the unique features of Plaintiff Capanelli's appearance. (Vincent Decl. ¶¶ 20-21).

17. Mr. Vincent's identification was further reinforced by his belief that Plaintiff Capanelli had both a motive to deface Mr. Quick's locker and a unique opportunity to do so as compared to all other pressmen working at the time. (Vincent Decl. ¶¶ 22-24).

18. The person whose image was depicted on the videotape was also identified by 10 pressmen who worked for the Post as being that of Plaintiff Capanelli, and such identification occurred before Defendants referred the matter of Plaintiff's vandalism to the Bronx County District Attorney's Office ("*Bronx DAO*"). (Vincent Decl. ¶ 25; Vazquez Decl. ¶¶ 21-22).

19. On December 18, 2003, Mr. Vincent conducted a disciplinary interview of Plaintiff Capanelli in which he gave Plaintiff an opportunity to explain the Post's evidence of his involvement in the vandalism of Jason Quick's locker, but Plaintiff failed and refused to provide Mr. Vincent with any legitimate explanation as to why he was present at Mr. Quick's locker at the time the vandalism occurred. (Vincent Decl. ¶ 26).

20. Subsequent to Plaintiff's discharge from the Post, the neutral arbitrator who heard the grievance filed by Plaintiff Capanelli challenging his discharge and who had ample opportunity to observe Plaintiff Capanelli in person, determined that the image on the videotape bore a very strong resemblance to Capanelli. (Vincent Decl. ¶ 30 & Ex. B).

**The Post's Referral Of The**
**Vandalism To The Authorities.**

21. In or about January 2004, Mr. Vincent asked Mr. Vazquez to refer the matter of the vandalism of Jason Quick's locker to the appropriate police authorities. (Vincent Decl. ¶ 27; Vazquez Decl. ¶¶ 23-24).

22. Mr. Vincent never affirmatively induced any police officer or detective to confine or arrest Mr. Capanelli, and in fact, never spoke with anyone at the Bronx DAO at all concerning Mr. Capanelli and the incidents related to the harassment of Jason Quick until the Assistant District Attorney handling Mr. Capanelli's criminal trial contacted him to appear as a witness. (Vincent Decl. ¶¶ 27-28).

23. In or about January 2004, Mr. Vazquez gave to the Bronx DAO the videotape for the period October 23 to October 24, 2003, and informed them that it pictured an individual defacing Jason Quick's locker and that the individual pictured was Christopher Capanelli. (Vazquez Decl. ¶ 23).

24. Following his meeting with the Bronx DAO, Mr. Vazquez received by telefax, signed, and returned a criminal information independently prepared by the Bronx DAO accusing Plaintiff Capanelli of various misdemeanors in connection with the making of graffiti on Jason Quick's locker. (Vazquez Decl. ¶¶ 25-27).

25. Although he did not prepare it, each statement of information attributed to Mr. Vazquez in the criminal information is true, and Mr. Vazquez believed each to be true at the time he signed it. Mr. Vazquez did not knowingly conceal or fail to disclose to the police of Bronx DAO any item of information that was relevant to Plaintiff Capanelli's vandalism of Jason Quick's locker on October 24, 2003. (Vazquez Decl. ¶ 27).

26. Mr. Vazquez never affirmatively induced any police officer or detective to confine or arrest Capanelli, nor did he play an active role in Mr. Capanelli's subsequent prosecution, give advice or encouragement to the Bronx DAO, or importune the authorities to take action against Capanelli. (Vazquez Decl. ¶¶ 24, 29).

**Plaintiff's Arrest and Prosecution.**

27. On February 23, 2004, Plaintiff, accompanied by counsel, voluntarily surrendered himself to the Bronx DAO, and was subsequently "booked" by Detective John P. Wall, given a Desk Appearance Ticket, and released the same day. (Capanelli Dep. 26:3-12, 33:7-35:13).

28. Plaintiff Capanelli never returned to the Bronx DAO after February 23, 2004. (Capanelli Dep. 54:11-55:4).

29. Plaintiff Capanelli voluntarily appeared in court for his criminal trial on various dates between April 12, 2004 and January 13, 2006. (Pltf. Interrog. Ans. No. 1).

30. A judicial officer was present at each and every one of Plaintiff Capanelli's court appearances. (Capanelli Dep. 72:16-73:10).

31. Plaintiff was not restrained during his criminal trial – or at any other time after his "booking" by Detective Wall. (Capanelli Dep. 73:3-7, 197:14-20).

Dated: New York, New York
August 14, 2008

HOGAN & HARTSON LLP

By: s/ Michael Starr

Michael Starr (MS 6851)
875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
Fax: (212) 918-3100

*Attorneys for Defendants*

6