```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
CHRISTOPHER CAPANELLI,              :  06 Civ. 15397 (SHS) (JCF)
                                    :
                Plaintiff,          :      REPORT AND
                                    :      RECOMMENDATION
        - against -                 :
                                    :
NYP HOLDINGS, INC. d/b/a NEW YORK   :
POST, JOSEPH VINCENT, and LLOYD     :
VASQUEZ,                            :
                                    :
                Defendants.         :
- - - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J:

   This case concerns the events surrounding the vandalism of a New York Post employee's locker.  Plaintiff Christopher Capanelli was arrested, tried, and then acquitted of vandalism-related criminal charges.  Now he is suing his employer, NYP Holdings (the "Post"), and defendants Joseph Vincent and Lloyd Vazquez[1] for claims stemming from that arrest and prosecution.  The defendants have moved for summary judgment on the two remaining claims in this case, false imprisonment and malicious prosecution.  The plaintiff has now withdrawn his claim for false imprisonment.  I recommend that the defendants' motion for summary judgment on the malicious prosecution claim be granted in part and denied in part.

---

   [1] While Mr. Vazquez's name is spelled "Vasquez" in the caption to this case, he has indicated that "Vazquez" is the correct spelling.  (Declaration of Lloyd Vazquez dated Aug. 8, 2008 ("Vazquez Decl."), ¶ 1).

1

Background

    A. Factual Background

        1. The Vandalism

    In late October, 2003, the derogatory word "scab"[2] was etched into the door of Jason Quick's locker. (Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. Facts"), ¶ 9; Plaintiff's Counter Local Rule 56.1 Statement of Facts ("Pl. Facts"), ¶ 9). Mr. Quick was a pressman for the Post who had recently been admitted to the pressman's union at the time of the incident. There had been an ongoing problem with vandalism to Mr. Quick's locker for some time prior to the incident at issue. (Def. Facts, ¶¶ 6-7; Pl. Facts, ¶¶ 6-7). As a result, the Post installed a hidden surveillance camera in the pressmen's locker room, aimed at Mr. Quick's locker, to catch future acts of mischief on tape. (Def. Facts, ¶ 8).

    The parties dispute the exact date on which the vandalism occurred. Mr. Quick himself reported the vandalism to Mr. Vazquez on October 24, 2003, but he had been absent from work for at least the five days previous days. (Def. Facts, ¶ 9; Pl. Facts, ¶ 9). At the time of the vandalism, Mr. Vazquez was a Security Manager for the Post; since 2004, he has served as the Post's Director of Security. (Vazquez Decl., ¶ 1). The defendants argue that Mr.

---

    [2] "Scab" is a "term of intense denunciation directed to hourly workers who are regarded as being disloyal to their union and their co-workers." (Def. Facts, ¶ 11).

Vazquez specifically looked at Mr. Quick's locker around 4:30 p.m. on October 23, 2003 and saw no damage; the next day Mr. Quick reported the vandalism and Mr. Vazquez personally observed it. (Def. Facts, ¶¶ 9-10). The defendants also rely on the testimony of Christopher Nash, a Post employee with a locker near Mr. Quick's, who agrees that the graffiti did not appear until the evening of October 23 or the morning of October 24, 2003. (Declaration of Christopher Nash dated Oct. 15, 2008 ("Nash Decl."), ¶¶ 5-8). By contrast, Mr. Capanelli argues that the vandalism occurred approximately two days earlier, on October 21 or 22, 2003. (Pl. Facts, ¶¶ 12, 17). He relies on prior testimony by two Post employees, Thomas Coffin and Frank Donnatin, who have lockers near Mr. Quick's, that they first saw the word "scab" on Mr. Quick's locker on the morning of October 22, 2003. (Pl. Facts, ¶ 12).

One videotape from the hidden camera shows someone approach Mr. Quick's locker at about 2:35 a.m. on October 24, 2003. (Def. Facts, ¶ 13; Vazquez Decl., ¶ 16). This video was evidence at Mr. Capanelli's criminal trial and at an arbitration hearing regarding whether the Post was justified in firing Mr. Capanelli as a result of this incident. No one disputes that the video is of low quality. The parties do disagree about who is depicted in the video and what that person did once he approached the locker. The defendants argue that the video shows Mr. Capanelli vandalizing the

locker.    They say that when Joseph Vincent -- the Vice President

and, at times, Senior Vice President of Operations for the Post --

saw the video, he immediately recognized the person in the video as

Mr. Capanelli.  (Def. Facts, ¶ 15; Declaration of Joseph B. Vincent

dated Aug. 8, 2008 ("Vincent Decl."), ¶¶ 1, 19).  When asked by Mr.

Vazquez in November 2003, ten other pressmen at the Post also

identified the man in the video as the plaintiff.  (Def. Facts, ¶

18; Signed Statements by 10 Pressmen ("10 Statements"), attached to

Vincent Decl.; Vazquez Decl., ¶ 22).  Both Mr. Vazquez and Mr.

Vincent have said that the video appears to show a person defacing

the locker.  (Vazquez Decl., ¶ 16; Vincent Decl., ¶ 19).  By

contrast, the plaintiff argues that the video shows neither Mr.

Capanelli nor any act of vandalism.  (Pl. Facts, ¶¶ 13-15).  In

particular, he contends that the person in the video does not

resemble him, and in fact could be any of "a large number of Post

employees." (Pl. Facts, ¶ 16).  The arbitrator who adjudicated Mr.

Capanelli's firing found that the man in the video looked very

similar to Mr. Capanelli, but could not definitely be said to be

him, and that it was not clear whether the figure in the video was

defacing the locker.  (Opinion and Award in NYP Holdings, Inc. v.

New York Newspaper Printing Pressmen's Union Local No. 2, AAA Case

No. 13 300 0081 04 ("Arbitration Opinion"), attached as Exh. B to

Def. Facts, at 6 ("[I]t is impossible to be reasonably sure in what

kind of activity the person pictured is actually engaged."), 8-10

(finding the image "bears a strong resemblance to Capanelli but . . . does not establish that Mr. Capanelli was the individual on the videotape," and that "the resemblance between the shadowy figure shown and [Mr. Capanelli] is quite strong.")).  The videotape itself has not been proffered to the Court as evidence in connection with the current motion.

The surveillance camera was in generally constant use between the end of September and the end of November, 2003.  (Testimony of Lloyd Vazquez ("Vazquez Tr."), attached as Exh. F to Pl. Facts, at 248).  The transcript from Mr. Capanelli's criminal trial indicates that there was some problem with the camera on October 18 (Vazquez Tr. at 248), and the arbitration decision notes that "during the period between October 18, 2003 and October 23, 2003 there were periods where no recording occurred."  (Arbitration Opinion at 4). According to Mr. Vazquez, it was his practice to view personally all of the surveillance tapes produced, and he testified at Mr. Capanelli's criminal trial that he did in fact view them all. (Vazquez Decl., ¶ 4; Vazquez Tr. at 259).  However, the Post no longer possesses the tapes recorded prior to October 24, 2003. (Vazquez Tr. at 278).  At some point after viewing them all, Mr. Vazquez destroyed those tapes.  (Vazquez Tr. at 278).

2.   The Post's Reaction to the Vandalism

After Mr. Quick reported the vandalism to Mr. Vazquez on October 24, 2003, Mr. Vazquez and Mr. Vincent both reviewed the

surveillance tape for the early morning of October 24, 2003. From late November to early December, Mr. Vazquez also met with 10 pressmen who viewed the videotape and identified the individual in the recording as Mr. Capanelli. (Vincent Decl., ¶ 25; Vazquez Decl., ¶ 22; 10 Statements). On December 18, 2003, Mr. Vincent held an interview with Mr. Capanelli in which the vandalism incident was discussed and Mr. Capanelli was fired. (Def. Facts at 4; Pl. Facts at 8).

In January 2004, Mr. Vincent asked Mr. Vazquez to "refer the matter of the vandalism of Jason Quick's locker to the appropriate police authorities." (Def. Facts, ¶ 21; Vincent Decl., ¶ 27; Vazquez Decl., ¶¶ 23-24). According to the defendants, Mr. Vazquez contacted the police "[i]n or about" January 2004, gave the Bronx District Attorney's Office ("DAO") and Detective John Wall the October 24, 2003 videotape, and told them that the video showed Mr. Capanelli defacing Mr. Quick's locker. (Def. Facts, ¶ 23; Vazquez Decl., ¶ 23). The Bronx DAO later faxed Mr. Vazquez a criminal information accusing Mr. Capanelli of the vandalism, which he signed and returned. (Vazquez Decl., ¶¶ 25-26). An Assistant District Attorney contacted Mr. Vazquez "[m]any months later" and asked him to testify at Mr. Capanelli's criminal trial. (Vazquez Decl., ¶ 28). Both sides agree that the criminal information was based in part on the information Mr. Vazquez provided to the Bronx DAO and Detective Wall. (Vazquez Decl., ¶ 27; Pl. Facts, ¶ 24).

6

The plaintiff argues that Mr. Vazquez attempted to make a criminal complaint to the police, but the police thought the evidence did not provide probable cause to arrest and charge Mr. Capanelli.  (Pl. Facts, ¶¶ 23, 26).  He then claims that Mr. Vazquez "leveraged his connections with the Bronx DAO to have Mr. Capanelli arrested and prosecuted." (Pl. Facts, ¶ 26).  In support of this theory, he asserts that during his arrest, Detective Wall justified his arrest by saying "It's not what you know, it's who you know" -- indicating that Mr. Capanelli was arrested due to the Post's political connections.  (Affidavit of Christopher Capanelli dated Sept. 26, 2008 ("Capanelli Aff."), ¶¶ 21-22).  He argues that the fact that Mr. Vazquez used to be a police officer, and that he worked with the Bronx DAO in that role, shows Mr. Vazquez had close ties with the Bronx DAO.  (Capanelli Aff., ¶ 21; Vazquez Testimony at 344).  Both parties agree that Mr. Capanelli was arrested on February 23, 2004.  (Plaintiff's Response to Defendants' Interrogatories, attached as Exh. D to Def. Facts, ¶ 1).

### 3.  Capanelli's Criminal Trial

From January 8 to 13, 2006, Mr. Capanelli was tried on criminal charges in connection with the October 2003 vandalism.  (Capanelli Aff., ¶ 25).  He also had to appear in court on other dates from April through January 2006.  (Def. Facts, ¶ 29; Pl. Facts, ¶ 29).  After the jury trial, he was acquitted of all charges.  (Capanelli Aff., ¶¶ 25, 33).

7

Both Mr. Vazquez and Mr. Vincent testified during the trial. Mr. Capanelli claims that they testified falsely, violated the judge's in limine rulings, and tried to usurp the role of the prosecutors. The defendants deny these allegations.

B. Procedural History

Mr. Capanelli first filed the current action in New York State Supreme Court on October 25, 2006, asserting a variety of claims. The defendants removed the case to federal court on December 22, 2006 on the basis of federal question jurisdiction.[3] (Notice of Removal dated December 22, 2006). The defendants subsequently moved to dismiss the complaint, and on November 6, 2007 their motion was granted in part and denied in part. (Order dated Nov. 6, 2007). On February 27, 2008, Mr. Capanelli filed an Amended Complaint asserting only (1) malicious prosecution claims against the Post, Mr. Vincent, and Mr. Vazquez and (2) false imprisonment claims against Mr. Vincent and Mr. Vazquez. While all of the federal claims have now been dropped or dismissed, this Court retains supplemental jurisdiction over the malicious prosecution and false imprisonment state claims, and on October 13, 2008, the Honorable Sidney H. Stein rejected the plaintiff's request that the case be remanded back to New York State Supreme Court. (Memorandum

---

[3] At that time, the case contained numerous federal claims, including claims implicating the Labor Management Relations Act, the National Labor Relations Act, and Mr. Capanelli's federal constitutional rights.

Endorsement dated October 13, 2008; Memorandum Endorsement dated October 16, 2008).

On August 14, 2008, the defendants moved for summary judgment on the remaining claims.[4]

Discussion

A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999). The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The opposing party then must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Where the non-movant fails to make "a

---

[4] After briefing was complete, Mr. Capanelli requested the opportunity to submit a sur-reply, which I granted only to allow him to respond to certain evidentiary issues raised in defendants' reply brief. Mr. Capanelli submitted his sur-reply on October 24, 2008, and the defendants then requested that it be stricken for having addressed issues beyond the scope of my order. Here, I only rely on Mr. Capanelli's sur-reply to the extent it discusses evidentiary issues that I permitted him to address.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. Celotex, 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. Id. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)).

In addition, the court's review of the record is limited to facts that would be admissible at trial. Rule 56(e) states that affidavits in support of or against summary judgment shall "set out facts that would be admissible in evidence." Fed. R. Civ. P.

56(e).  Accordingly, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  A party may not oppose a summary judgment motion on the basis of inadmissible evidence, unless the party can "show[] that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985); see also Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.").  Therefore, "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." Raskin, 125 F.3d at 66.  "When an affidavit itself is not admissible, then 'an implicit or explicit showing that the affiant is prepared to testify in a manner consistent with [the] affidavit is required to oppose summary judgment.'" Chamberlin v. Principi, No. 02 Civ. 8357, 2005 WL 1963942, at *10 (S.D.N.Y. Aug. 16, 2005) (quoting Santos, 243 F.3d at 684).

    B. False Imprisonment

    The defendants initially moved for summary judgment on Mr. Capanelli's false imprisonment claims on the basis that they are time barred and that he has not presented facts sufficient to support all the elements of these claims. (Defendants' Memorandum

of Law in Support of Their Motion for Summary Judgement ("Def. Memo.") at 5-10). In response, Mr. Capanelli withdrew his false imprisonment claims "based on the applicable statute of limitations." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Memo.") at 1).

C. <u>Malicious Prosecution</u>

The defendants claim that there is not enough evidence for a reasonable jury to find in favor of the plaintiff on his malicious prosecution claims. The defendants here will prevail if they can show that, construing all admissible facts in favor of the plaintiff, Mr. Capanelli has failed to present factual support for all elements of his malicious prosecution claim sufficient to allow a reasonable jury to find for him. <u>See</u> <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005).

In order to allow accusers "room for benign misjudgments," New York law "places a heavy burden on malicious prosecution plaintiffs." <u>Smith-Hunter v. Haravey</u>, 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438, 440 (2000). Thus, a malicious prosecution claim must include four elements: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." <u>Id.</u> at 195, 712 N.Y.S.2d at 440-41 (citing <u>Broughton v. State of New York</u>, 37 N.Y.2d 451, 457, 373 N.Y.S.2d

12

87, 94 (1975)).  The second prong is not at issue in this case. Below, I discuss the claims against each defendant separately.

    1.  <u>Defendant Vazquez</u>

        a.  <u>Commencement or Continuation of a Criminal Proceeding</u>

"In order for a civilian defendant to be considered to have initiated the criminal proceeding, 'it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'"  <u>Lupski v. County of Nassau</u>, 32 A.D.3d 997, 998, 822 N.Y.S.2d 112, 114 (2d Dep't 2006) (quoting <u>Viza v. Town of Greece</u>, 94 A.D.2d 965, 966, 463 N.Y.S.2d 970, 971 (4th Dep't 1983)); <u>see also</u> <u>Maskantz v. Hayes</u>, 39 A.D.3d 211, 213, 832 N.Y.S.2d 566, 569 (1st Dep't 2007). "The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." <u>Lupski</u>, 32 A.D.3d at 998, 822 N.Y.S.2d at 114 (quoting <u>Mesiti v. Wegman</u>, 307 A.D.2d 339, 340, 763 N.Y.S.2d 67, 69 (2d Dep't 2003).  Merely providing information to the police and signing a criminal complaint, or otherwise cooperating with the police, is not enough to show commencement or continuation for the purposes of a malicious prosecution claim.  <u>See</u> <u>Cotter v. Summit Security Services, Inc.</u>, 14 A.D.3d 475, 475, 788 N.Y.S.2d 153, 154 (2d Dep't 2005) (finding defendant who merely supplied information to police,

who then determined arrest was appropriate, was not liable for malicious prosecution); Brown v. Sears Roebuck and Co., 297 A.D.2d 205, 209, 746 N.Y.S.2d 141, 146 (1st Dep't 2002) (finding defendant former employer did not commence prosecution by investigating plaintiff's conduct and giving information to police). However, a malicious prosecution claim may arise if a defendant knowingly provides false information to the police and the police rely directly on that information in prosecuting. See Brown, 297 A.D.2d at 210, 746 N.Y.S.2d at 146 ("[A] defendant may be said to have initiated a criminal proceeding by providing false evidence to the police" which they relied upon "or withholding evidence that might affect the determination by the police to make an arrest."). If the police instead rely on independent information from their investigation in bringing charges against the plaintiff, then the civilian defendant is not liable for malicious prosecution.

Mr. Capanelli claims that, in fact, the defendants (1) intentionally lied to the police, (2) withheld evidence, (3) actively "leverag[ed] close ties to the Bronx DAO in order to have Mr. Capanelli arrested and charged," and (4) gave false testimony during Mr. Capanelli's trial in an "attemp[t] to control and usurp the prosecutor's role." (Pl. Memo. at 7-8). In addition, he asserts that the "Bronx DAO did not conduct any independent investigation before issuing the criminal information and arresting Mr. Capanelli." (Pl. Memo. at 8). I will address each of these

theories separately.

Key to all of Mr. Capanelli's arguments is his claim that the vandalism occurred before October 24, 2003, and that Mr. Vazquez knew this to be the case at the time. According to the testimony of Mr. Coffin and Mr. Donnatin at the criminal trial, the word "scab" appeared on Mr. Quick's locker on October 21 or 22, 2003. Mr. Capanelli then points to Mr. Vazquez's testimony that continuous surveillance videos were taken of Mr. Quick's locker from September through November 2003, and that Mr. Vazquez always reviewed all of the videotapes. (Pl. Memo. at 8-9). He infers from this that Mr. Vazquez must have seen the true vandal on videotape two days earlier, and thus have known that the October 24, 2003 video did not show the vandalism. The plaintiff argues that this theory is further supported by the defendants' destruction of the videotapes from the days prior to October 24, 2003.

The defendants argue that Mr. Coffin's and Mr. Donnatin's testimony cannot be considered in connection with summary judgment because their statements would not be admissible at trial. While these witnesses refused to sign affidavits in connection with this summary judgment motion, the plaintiff has presented their prior testimony from his criminal trial. (Testimony of Thomas Coffin dated Jan. 10, 2006 ("Coffin Testimony"), attached as Exh. H to Pl. Facts; Testimony of Frank Donnatin dated Jan. 10, 2006 ("Donnatin

Testimony"), attached as Exh. I to Pl. Facts). In 2006, Mr. Coffin resided in Nassau County and Mr. Donnatin resided in Suffolk County. (Coffin Testimony at 546; Donnatin Testimony at 528). There is no evidence that either has moved, both continue to be employed in New York by the Post (Affirmation of Michael Goldfarb dated Sept. 29, 2008 ("Goldfarb Aff."), attached to Pl. Facts, ¶¶ 2-3), and there is no reason to think that either witness will be beyond this Court's subpoena power at the time of trial. See Fed. R. Civ. P. 45. Thus, their prior testimony may be considered in determining this summary judgment motion. The defendants point out that the plaintiff did not make any efforts to depose either witness during discovery (Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment at 3), but this is irrelevant; the plaintiff is not required to depose every individual he intends to call as a witness at trial. The defendants present their own substantial evidence that the vandalism did not occur until October 24, 2003, including in part the testimony of Mr. Vazquez and Mr. Nash. They also attack Mr. Coffin's credibility with his prior sworn testimony in which he stated in January 2004 that he told Mr. Vazquez that he knew nothing about the vandalism incident or when it occurred. (Criminal Trial Testimony of Thomas Coffin, attached as Exh. K to Affirmation of Michael Starr dated Oct. 16, 2008 ("Starr Aff."), at 567-69; Arbitration Hearing Testimony of Thomas Coffin, attached as

16

Exh. L to Starr Aff., at 641-44).  But, while the defendants'
evidence is strong, it is not the role of the Court to weigh the
proof at this stage.  Therefore, the date of the vandalism remains
an issue of material fact to be determined at trial.

Assuming that the vandalism in fact happened between October
21 and 22, 2003, there is evidence in the record that surveillance
tapes were taken continuously between September and November 2003
(Transcript from Capanelli Criminal Trial ("Tr."), attached as Exh.
F to Pl. Facts, at 248), and that Mr. Vazquez, as a regular
practice, reviewed all those tapes. (Vazquez Decl., ¶ 13; Tr. at
259).  Thus, a reasonable jury could infer that Mr. Vazquez knew
when he gave the October 24, 2003 video to the police and told them
it depicted the vandalism that this information was false.  See
Albert v. Loksen, 239 F.3d 256, 267 (2d Cir. 2001) (finding, in
defamation case, that evidence that defendant co-authored written
statements was "concededly sparse" but sufficient for jury to find
defendant made same statements orally, thus allowing claim to
survive summary judgment); Rounseville v. Zahl, 13 F.3d 625, 630
(2d Cir. 1994) (denying summary judgment in malicious prosecution
case despite "sparse factual record" because jury could infer that
defendants complained to police without reasonable belief that
illegal acts occurred); Butts v. New York City Department of
Housing Preservation and Development, No. 00 Civ. 6307, 2007 WL
259937, at *15 (S.D.N.Y. Jan. 29, 2007) (finding evidence

sufficient to survive summary judgment even though "drawing an inference" of wrongdoing from such evidence "stretches the boundary of reasonability"); Lederer v. BP Products North America, No. 04 Civ. 9664, 2006 WL 3486787, at *7 (S.D.N.Y. Nov. 20, 2006) (finding that plaintiff's employment discrimination claims survive summary judgment even though evidence was "thin" and "the odds of plaintiff's obtaining a favorable verdict may be long").

i. Intentionally Lying; Withholding Evidence; and Testifying Falsely

Presuming Mr. Vazquez knew the vandalism occurred on October 21 or 22, 2003 before he reported the incident to the police, three of the plaintiff's four theories of commencement or continuation are viable, if just barely. A reasonable jury could find that Mr. Vazquez knew when he reported the vandalism to the police and gave them the October 24, 2003 video that the information he provided was false. A jury could also find that he knowingly withheld evidence of the actual vandalism when he failed to turn over the proper surveillance tape. Further, a jury could find that the police relied on Mr. Vazquez's false evidence in commencing the prosecution. From the face of the criminal information, the police relied heavily on Mr. Vazquez's testimony both to determine the timing of the vandalism and to infer from that that the October 24, 2003 video showed the vandalism in progress. These crucial facts substantially justified Mr. Capanelli's arrest and charge. (Criminal Information, attached as Exh. G to Pl. Facts ("Criminal

Information")).  Finally, a reasonable jury could find that Mr. Vazquez later testified falsely to these facts at trial.  <u>See</u> <u>White v. Frank</u>, 855 F.2d 956, 958-60 (2d Cir. 1988) (finding that "complaining witness" with role in initiating baseless prosecution was not immune to liability for malicious prosecution); <u>Cipolla v. County of Rensselaer</u>, 129 F. Supp. 2d 436, 450-51 (N.D.N.Y. 2001) (same); <u>Morillo v City of New York</u>, No. 95 Civ. 2176, 1997 WL 72155, at *5 (S.D.N.Y. Feb. 20, 1997) (finding "falsely testifying before the grand jury and at [plaintiff's] criminal trial" to constitute commencement of malicious prosecution).

ii.   <u>Procuring Prosecution Through Political Connections</u>

As his fourth theory, the plaintiff argues that the defendants "played a very 'active role'" in commencing prosecution by asserting political pressure on the Bronx DAO and the police to arrest Mr. Capanelli.  (Pl. Memo. at 11).  However, this theory is based entirely on speculation and inadmissible evidence.

Mr. Capanelli first argues that statements made to him during his arrest show that Mr. Vazquez used political connections to trigger the arrest.  (Pl. Memo. at 12).  Specifically, he claims that while his arrest was being processed, Detective Wall explained, "It's not what you know, it's who you know." (Capanelli Aff., ¶ 21).  Mr. Capanelli argues that this statement referred to Mr. Vazquez's "close ties to the Bronx DAO."  (Capanelli Aff., ¶ 21).  However, this evidence is neither convincing nor admissible.

19

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. § 801.  A hearsay statement introduced when the declarant is personally available to testify is only admissible under certain circumstances.  See Fed. R. Evid. 803.[5]  Here, Mr. Capanelli seeks to introduce Detective Wall's statement for what he interprets to be the truth of the matter asserted -- that is, that the veiled message in Detective Wall's statement is evidence that his arrest was, in fact, based on the Post's political influence.  Not only is Mr. Capanelli's chosen interpretation open to dispute, but there is no indication that Detective Wall will be unavailable to testify at trial, and none of the Rule 803 exceptions to the hearsay rule apply here.  See Fed. R. Evid. 803.  Thus, though the affiant -- Mr. Capanelli -- will be available at trial, he may not testify about this matter.  See Chamberlin, 2005 WL 1963942, at *10 (quoting Santos, 243 F.3d at 684).  In addition, Mr. Capanelli offers the affidavit of his wife (who is also one of his attorneys), Susan Bender Capanelli, claiming that she heard him make the same claim about Detective Wall's statement on the day of his arrest and on other occasions. (Surreply Affidavit of Susan Bender Capanelli dated October 23,

---

[5] These circumstances include when the statement gives a present sense impression; the statement is an excited utterance; the statement describes the declarant's then existing mental, emotional, or physical condition; the statement is for medical diagnosis or treatment purposes; the statement regards a recorded recollection; or the statement concerns a witness's reputation.

2008, ¶ 2).  This evidence is irrelevant, since Mr. Capanelli will not himself be able to testify to this matter in court.  Thus, Detective Wall's statement is excluded.

Mr. Capanelli next presents a statement by Mr. Vazquez during Mr. Capanelli's criminal trial to show he has political connections with the Bronx DAO.  Namely, when asked at trial whether, "in [his] prior life as a police officer . . . [he] work[ed] with the Bronx district attorney's office," Mr. Vazquez responded "Oh, yes, sure." (Tr. at 344).  It is a stretch to argue that this evidence shows Mr. Vazquez was even in a position to pressure the police department or the Bronx DAO to arrest Mr. Capanelli, and provides no evidence that he actually did so.

Finally, in Mr. Capanelli's affidavit and surreply, he claims that a Ralph LaNoce told him that Mr. Vazquez said he had gone to give the police the October 24, 2003 video and make a criminal complaint, but that the police refused to arrest Mr. Capanelli for lack of evidence.  (Capanelli Aff., ¶ 22; Plaintiff's Surreply Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 4).  Mr. Capanelli thus offers a secondhand rumor in support of his theory that the Post procured his arrest using political pressure on the DAO because the police refused to effectuate an arrest based on the videotape and Mr. Vazquez's testimony alone.  However, again, Mr. Capanelli's statements regarding Mr. LaNoce's statements are inadmissible hearsay.  <u>See</u>

Fed. R. Evid. 803.

Therefore, Mr. Capanelli has failed to present sufficient evidence for a reasonable jury to conclude that Mr. Vazquez procured his arrest using improper influence.

b.  <u>Absence of Probable Cause</u>

In New York, probable cause in a malicious prosecution proceeding is defined as knowledge of facts and circumstances that "would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." <u>Ramos v. City of New York</u>, 285 A.D.2d 284, 299, 729 N.Y.S.2d 678, 690 (1st Dep't 2003) (quoting <u>Colon v. City of New York</u>, 60 N.Y.2d 78, 82, 455 N.Y.S.2d 1248, 1250 (1983)).  A lack of probable cause can be shown by evidence that the defendants "have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." <u>Colon</u>, 60 N.Y.2d at 82, 455 N.Y.S.2d at 1250; <u>accord</u> <u>Ramos</u>, 285 A.D.2d at 299, 729 N.Y.S.2d at 690; <u>Lupski v. County of Nassau</u>, 32 A.D.3d 997, 998-99, 822 N.Y.S.2d 112, 114 (2d Dep't 2006).  Here, evidence that Mr. Vazquez potentially knew that the vandalism happened prior to October 24, and thus knowingly made misrepresentations, falsified evidence to the police, or withheld evidence, is sufficient to find a lack of probable cause.  While significant evidence exists to rebut all of these claims, on summary judgment

22

the Court must give the benefit of the doubt to Mr. Capanelli in interpreting the evidence.

However, the Second Circuit has also found it is not enough to merely "prov[e] that the complainant told lies to the police." Rothstein v. Carriere, 373 F.3d 275, 295 (2d Cir. 2004). Rather, the plaintiff must also show that the prosecution was not otherwise supported by probable cause at the time it was commenced. Id. at 292, 295. Here, a reasonable jury could find that the arrest would have lacked probable cause absent the information Mr. Vazquez's told the police because the criminal information suggests that the police relied heavily on that information in interpreting the October 24, 2003 videotape as depicting Mr. Capanelli committing vandalism and in determining that the vandalism occurred on that date. (Criminal Information).

### c. Malice

To find a defendant liable for malicious prosecution, the plaintiff must show that the defendant acted with "actual malice," which is defined as "a wrong or improper motive, something other than a desire to see the ends of justice served." Present v. Avon Products, Inc., 253 A.D.2d 183, 190, 687 N.Y.S.2d 330, 335 (1st Dep't 1999) (internal quotation marks omitted). "A jury may infer the existence of actual malice from the absence of probable cause." Loeb v. Teitelbaum, 77 A.D.2d 92, 104, 432 N.Y.S.2d 487, 495 (2d Dep't 1980). If Mr. Capanelli's prosecution lacked probable cause,

23

as discussed above, then the malice element is fulfilled.  In addition, if Mr. Vazquez knowingly lied to police, withheld evidence, or testified falsely, it seems clear that he acted with malice.  The defendants do not dispute in this case that once this Court finds a lack of probable cause, a finding of malice follows. (Def. Reply. Memo. at 13).

### 2.   Defendant NYP Holdings

Mr. Capanelli claims the Post is responsible for Mr. Vazquez's actions because "the defendants stood in such relationship to each other as to make each defendants liable for the acts and omissions of the other." (Amended Complaint, ¶ 10).  Apparently, he intends to hold the Post liable for Mr. Vazquez's actions based on the doctrine of respondeat superior, a doctrine that applies to a malicious prosecution claim asserted under state law.  See Fulton v. Felder, No. 05 Civ. 3652, 2007 WL 2213096, at *4 (S.D.N.Y. Aug. 2, 2007).  Accordingly, Mr. Capanelli's claim against the Post survives summary judgment.

### 3.   Defendant Vincent

Mr. Capanelli presents no evidence that Mr. Vincent might have known the vandalism occurred on any day other than October 24, 2003, had other knowledge that the October 24, 2003 videotape did not depict the vandalism, or was involved with withholding or falsifying evidence in any way.  Thus, no malicious prosecution claim can be sustained against Mr. Vincent.

Conclusion

For the reasons set forth above, I recommend that the defendants' motion for summary judgment be granted to the extent of dismissing the false imprisonment claims with respect to all defendants, dismissing all claims against Mr. Vincent, and dismissing the malicious prosecution claim insofar as it is based on an allegation of improper influence. I further recommend that the motion be denied with respect to the remaining malicious prosecution claims. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, Room 1010, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         December 18, 2008

25

Copies mailed this date:

Mark Kressner, Esq.
Michael Goldfarb, Esq.
Law Office of Mark Kressner
1937 Williamsbridge Road, 2nd Floor
Bronx, New York 10461

Michael G. Starr, Esq.
Vanessa M. Thomas, Esq.
Hogan & Hartson LLP
875 Third Avenue
New York, New York 10022